CERTIFIED TRANSLATION

Mayaguez Hilton Corp. v. Betancourt, 2002 JTS 29 (2002)
156 D.P.R. 234, 2002 TSPR 23

2002 JTS 29, 156 D.P.R. 234, 2002 WL 272598 (P.R.), 2002 TSPR 23

MAYAGUEZ HILTON CORPORATION
Petitioner,
Vs.
HUMBERTO BETANCOURT ET AL., Respondent.

In the Supreme Court of Puerto Rico
Number: CC-2000-259
Decided: February 19, 2002
Feb. 19, 2002

I. CONTRACTS -GENERALLY- INTERPRETATION-OBJECT-OPTION CONTRACT

The option contract is defined as the agreement by which a party -named grantor, promissor or optionor- grants the other-optionee-for a certain term and under certain conditions, the power, which is left exclusively at his will, to decide whether to sign a principal contract. The following are essential requirements of the option contract: one party granting the other the exclusive power to decide whether to sign the option contract, for a certain term with no other condition than the optionee's own judgment. *235

2. ID.-ID.-ID.-ID.-ID.

The right that gives rise to the option agreement is an elective or formation right that may be a constitutive right, a modifying right or an extinguishing right. The option contract, which is of a transitory nature, may be a principal agreement or an accessory agreement. Therefore, options are applicable to a vast number of contracts.

3. ID.-ID.-ID.-ID.-ID.

The doctrine of the option to renew refers to the faculty granted to one of the contracting parties to, at its will, decide whether to renew or extend a contract already in effect between the parties. In these cases, the option has the effect of a mere modification of the contractual relationship. It is, therefore, a modifying option.

4. ID.-ID.-ID.-ID.-ID

The right of option is extinguished through the positive exercise of the same, and the accepted contract thus comes into effect. It is also extinguished, without this positive effect, if [the optionee] does not make any statement, or makes a statement that has the effect of waiving the right. Because of the temporary nature of the contract, it cannot exist without a period within which to exercise the same, regardless of how short or undetermined this period is. Therefore, the period for the exercise of the option is usually viewed as one that expires. For that reason, the right of the optionee to express his will to give effect to the option contract expires if this is not notified to the grantor during the term of the option, if said term had been established.

5. ID.-ID.-ID.-ID.-ID.

The grantor of the option is doubly bound; he must not disturb the possible performance of the definitive contract and must also comply with the same. While the grantor shall not do anything that could frustrate the effectiveness of the contract if the optionee timely exercises his right, he also shall not incur in voluntary, negligent or fraudulent acts that could frustrate the expectation of the optionee to exercise his right of option. If he does, he will incur in contractual liability and the affected optionee may file an action for damages against the grantor that thwarted or damaged his exercise of the right to option.

6. ID.-ID.-ID.-ID.-ID.

Those that incur in fraudulent acts, negligence or delinquency with regards to their obligations, and those that in any way violate these, will be liable for damages. As the optionee is not allowed to request compliance in kind, he can request supplementary compliance in the form of damages. Damages encompass not only the value of the loss suffered but also the profit that the creditor failed to obtain. *236

7. ID.-SPECIFIC PERFORMANCE- PROCEDURES AND REMEDIES-STATUTE OF LIMITATIONS.

The right to file actions for noncompliance or breach of contract lapses after fifteen years, pursuant to Art. 1077 of the Civil Code, 31 L.P.R.A. sec. 3052.

8. ID-GENERALLY-COMPLIANCE-ACTS THAT CONSTITUTE BREACH OF CONTRACT- FRAUDULENT ACTS.

When speaking of breach of an obligation, a distinction should be made between willful and negligent breach, which depends on whether the obligor engaged in a willful violation or if the breach was caused by his negligent conduct. A willful act, in breach of contract, is the conscious and voluntary failure of the debtor to comply with his obligation, knowing it will bring about an unjust act. This assumes the obligor knows his obligation, is aware of the action or inaction that will take place and of its consequences. It does not necessarily imply the malicious intent of the debtor, only knowledge of his own breach, that it will affect the creditor's expectation.



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Mayaguez Hilton Corp. v. Betancourt, 2002 JTS 29 (2002)
156 D.P.R. 234, 2002 TSPR 23

9. ID.-ID.-ID.-ID.-ID.
The responsibility of proving both willful misconduct in the formation of the contract and willful misconduct in the performance of the obligation corresponds to whoever alleges said willful misconduct. It is a factual matter that cannot be based on the mere allegation of the claimant, proof needs to be provided, which must be exclusively evaluated by the judge of fist instance. However, even though the decision of whether willful misconduct was committed requires affirmative action by the one who alleges the existence of the willful misconduct, it is not necessary to use the words "willful misconduct" in the pleading. It will be enough to consider the nature of the claim to determine whether willful misconduct is alleged.

10. APPEAL AND REVIEW -REVIEW MATTERS OF FACT, VERDICTS AND CONCLUSIONS-APPRECIATION OF THE EVIDENCE-CONCLUSIONS-ABOUT DOCUMENTARY EVIDENCE.
As a general rule, a court of appeals cannot alter the conclusions of fact made by an inferior court unless they are clearly incorrect. However, it can alter the conclusions of fact when they are based solely on documentary evidence or expert witness testimony.

11. RULES OF CIVIL PROCEDURE- ALLEGATIONS AND MOTIONS-AMENDED AND SUPPLEMENTAL ALLEGATIONS-AMENDMENTS.
Amending the allegations using a motion for summary judgment or a motion to dismiss is a violation of the Rules of Civil Procedure, 32 L.P.R.A. Ap. III. Such motions cannot be considered and are not authorized allegations within the meaning of Rules 5.1 and 13 of Civil Procedure, 32 L.P.R.A. Ap. III. Moreover, there is an inveterate principle that allegations are not *237 evidence, therefore they also cannot be considered to be amended to adapt them to nonexistent evidence.

12. ID.-ID.-ID.-ID.
Rule 13.2 of Civil Procedure, 32 L.P.R.A. Ap. III states that, even in the absence of a formal amendment, when there is express or implicit consent of the parties to submit to trial matters not alleged in the pleadings, they will be considered as if they had been alleged in the pleadings. Said principle is applicable to situations in which new allegations are made during the trial, but not to situations where facts and controversies were evaluated and decided summarily.

13.-TRIAL-SPECIAL COMMISSIONERS- GENERALLY.

The appointment and faculties of a Special Commissioner are regulated by Rules 41.1 to 41.5 of Civil Procedure, 32 L.P.R.A. Ap. III. These state that a court in which a case or proceedings are pending may name a Special Commissioner in regards to said case or procedure. As an exception, and not as a general rule, this rule allows the court to assign a matter to a Special Commissioner, only if there are matters about accounts and difficult calculations of damages or cases that involve matters that are highly technical or of highly specialized knowledge.

*CERTIORARI* PETITION to request a review of a JUDGMENT by *Jocelyn Lopez Vilanova, Roberto Cordova Arone and Jorge L. Escribano Medina*, Judges of the Circuit Court of Appeals (Regional Circuit IV), that affirmed a judgment issued by the Court of First Instance regarding the right of the petitioner to collect lost profits under the terms of the renewed contract, affirmed the determination of willful misconduct in contracting and rejected the argument of the appointment of a Special Commissioner. *A judgment is hereby issued to affirm the decision of the Circuit Court of Appeals regarding the origin of the right of option by the appellee and the appointment of the Special Commissioner. The determination of the existence of willful misconduct in contracting by the petitioner is hereby reversed.*
*Anabelle Rodriguez and Juan A. Frau Escudero*, attorneys for petitioner; *Eugenio C. Romero and Rolando Anglada Gil*, attorneys of appellees.*238

ASSOCIATE JUDGE CORRADA DEL RIO issued the opinion of the Court.

I.

In 1990 the Mayaguez Hilton Hotel (hereinafter, Hilton) sued International Casino Management, Inc. (hereinafter, I.C.M.) and Humberto Betancourt (hereinafter, Mr. Betancourt) its principal shareholder, requesting a declaratory judgment to invalidate an agreement signed by them on March 20, 1986, titled *Casino Management Agreement*. 1  It additionally requested that the court authorize the sum of five hundred and eleven thousand five hundred and one dollars ($511,501) to be deposited in court on behalf of Mr. Betancourt towards the debt for the years 1987 to 1989, pursuant to the agreement in question.



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mayaguez Hilton Corp. v. Betancourt, 2002 JTS 29 (2002)
156 D.P.R. 234, 2002 TSPR 23

On December 18, 1987 Hilton and Mr. Betancourt signed a second agreement titled *Casino Consultant Agreement*, (hereinafter, consulting contract). The agreement stated that, starting on January 1st, 1988, Mr. Betancourt would serve as a consultant for the hotel regarding everything related to the operation of Hilton's casino. The second clause of the contract stated the following:

> This agreement will terminate on December 31, 1993, provided however that either party may terminate this agreement if the casino incurs in operating losses for two (2) consecutive years. *Provided, however that Mr. Betancourt has the option of renewing this contract for an additional five (5) years [sic] period if the first five (5) years of operation produce a net operating profit of two million five hundred thousand dollars ($2,500,000).* During the renewal period the operation must produce a net operating profit of five hundred thousand dollars ($500,000). Should the casino not produce a net margin of profit of five hundred *239 thousand dollars ($500,000) in any of the five (5) years this contract may terminate at Hilton's request. This agreement will terminate without liability to either party in the event Hilton's license terminates for any reason. (Our translation and emphasis added.)2

In light of Hilton's complaint, Mr. Betancourt filed a counterclaim and third party complaint against Hilton International, Hilton International of Puerto Rico Inc., Rupert E. Hubert, Mehdi Naqvi, Moises Rivas and Dieter Huckestein, officers of the aforementioned enterprises, their respective wives and the conjugal partnerships made up by them. 3 In the counterclaim, Mr. Betancourt mentioned the above-quoted clause, as an option right that the latter had to renew the consulting contract for five additional years, if the expressed condition was complied with.

On October 30, 1992, in a partial judgment, the Court of First Instance (hereinafter C.F.I.) found in favor of Hilton and decreed that the *Casino Management Agreement* was null as it violated the provisions of the Gambling Law.

On January 31, 1993, eleven months before the date of expiration of the contract, Hilton terminated the consulting contract. The parties tried to negotiate Mr. Betancourt's compensation from 1989 until 1992, a period in which the agreement was in effect. In light of *240 the complexity of the amounts claimed, the C.F.I. appointed a special commissioner.

Because of the early cancellation of the contract, on July 11, 1995 Mr. Betancourt filed a motion to amend the allegations of his counterclaim and third party complaint. The purpose of the motion was to go into detail regarding his claim for breach of contract and request payment for fees from 1994 through 1998, under the option granted in the consulting contract, if renewed for five (5) years.4

On October 31, 1996 Mr. Betancourt filed a Motion for Partial Summary Judgment in which he requested that the C.F.I. adopt the report filed by the appointed Special Commissioner and order the payment of the sums described therein. 5 He also requested to be awarded a compensation for the period between the early cancellation of the consulting contract and the date the expiration of the contract in question, as originally agreed, that is, from January 31 to December 31, 1993. Subsequently, on November 14, 1996, he filed another Motion for Partial Summary Judgment in which he alleged that Hilton's unilateral action in terminating the contract early prevented him from exercising his option to renew it for five additional years. 6 He alleged that the renewal option of the contract was subject to the condition that the operation of the casino during the first five years produce an operational net income of more than two million five hundred thousand dollars ($2,500,000), a condition that by the end of the second year of operations had been met. He added that Hilton, by cancelling the contract prevented the established term of five years of the consulting contract from concluding, thus attempting to avoid its obligation to renew *241 the option contract of Mr. Betancourt. Consequently, he requested that the C.F.I. determine by summary judgment that he had the right to renew the contract for five additional years.

On January 31, 1997 the C.F.I. through Partial Judgment declared the award Mr. Betancourt was entitled to from 1989 through 1993, in accordance with the sums recommended in the report of the Special Commissioner and decided the controversy regarding the early cancellation of the consulting contract. 7 However, the C.F.I., by court decision issued on the same date, expressly left the existence or inexistence of just cause for the early cancellation of said contract pending resolution. 8 Also, it did not decide the controversy regarding Mr. Betancourt's right to exercise the contractual option, which would have extended the contract for a second term of five years,



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Mayaguez Hilton Corp. v. Betancourt, 2002 JTS 29 (2002)
156 D.P.R. 234, 2002 TSPR 23

a claim alleged by him in his second motion for summary judgment, and the amount to be paid for said additional damages.

On June 19, 1997, Hilton filed a motion for reconsideration, which was denied by resolution dated June 25, 1997. The C.F.I. decided that the only matter left to resolve was the controversy regarding the right of Mr. Betancourt to extend the consulting contract for five additional years. 9 *242

Hilton timely filed before the Circuit Court of Appeals (hereinafter C.C.A.) a document titled *certiorari* Petition and/or appeal brief, by which it requested the review of the partial judgment issued by the C.F.I. on January 31, 1997. The appellate court rejected Hilton's arguments that the early cancellation of the contract was due to Mr. Betancourt's breach of its clauses, since these raised in an untimely fashion. The court confirmed the partial summary judgment issued by the C.F.I.

After various procedural incidents, on September 13, 1999 the C.F.I. granted the second motion for partial summary judgment filed by Mr. Betancourt on November 14, 1996. 10 The Court determined that the consulting agreement was an agreement for professional services and that the second clause of the agreement in question was not an option, but a renewal clause for an additional period of five years. 11 The Court also concluded that the renewal was an obligation subject to the condition precedent that during the first five years of the original contract the casino obtain a net profit of over two million five hundred thousand dollars (2,500,000). The Court held that Hilton by unjustly terminating the consulting contract before it expired prevented the existence of the conditions that would have made the second contract possible, although at the date of the cancellation of the contract, that is, January 31 1993, the condition that required the profit of two million five hundred thousand dollars (2,500,000) had already been satisfied. Applying Art. 1072 of the Civil Code, *243 31 L.P.R.A. sec. 3047, it concluded that this had the effect that the conditions were deemed to have been satisfied as if the right had been exercised.12

Lastly, it stressed that Hilton, in a wrongful manner, caused the impossibility of performance of the obligation by terminating the original contract before its expiration. Consequently, it ordered Hilton to pay Mr. Betancourt the amount that corresponded to the salary he did not receive for the time the new contract would have been in effect. 13 It held, additionally, that Mr. Betancourt should be compensated for the mental anguish that could have been foreseen at the time of the obligation and that were a necessary consequence of its breach. 14

Hilton appealed to the C.C.A. alleging that the clause in controversy was an option, and the term to exercise it had lapsed once the profit margin of two million five hundred thousand dollars ($2,500,000) was met15. It further questioned the decision of the C.F.I. that there had been willful misconduct in the cancellation of the contract. It stated that the controversy regarding the cancellation of the contract had been resolved previously by partial judgment issued on January 31, 1997 and that, it believed said judgment had not discussed the existence of willful contractual misconduct. Finally, it attacked the appointment of a Special Commissioner to determine the damages. *244

Through Judgment of February 15, 2000, the C.C.A. confirmed, although on different grounds, the decision of the C.F.I. It stated that the clause in question was that of an option to renew. It added that, although the renewal of the contract could only be made if the condition precedent was met, even if the condition had been met, Mr. Betancourt retained the right to exercise or reject the option to renew. It decided that since the condition was met the renewal option remained in effect in favor of Mr. Betancourt. Regarding the term to exercise the option, it stated that Mr. Betancourt had the right to exercise it when the term of the original contract expired, that is, on December 31, 1993. It emphasized that when Hilton unilaterally ended the contract eleven months before it expired, it deprived Mr. Betancourt of the opportunity to exercise his option right, because at the moment that said right was to be exercised the contract was already terminated. It concluded that Hilton could not benefit from its illegal acts to deprive Mr. Betancourt of his option right. Considering that he exercised his right of option through the judicial system in a timely manner, the C.C.A. affirmed the C.F.I. decision regarding the right to collect lost profits under the terms of the renewed contract. It also confirmed the determination of willful contractual misconduct 16 and rejected Hilton's arguments regarding the appointment of a Special Commissioner.

Unsatisfied with the aforementioned decision, Hilton appeals to this Court, via certiorari and argues that the following errors were made:

First Error

The Circuit Court of Appeals erred by deciding that the Mayaguez Hilton committed willful contractual misconduct, in spite of the fact that the beneficiary of that determination [,] Humberto Betancourt never alleged nor claimed willful contractual misconduct. *245



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Mayaguez Hilton Corp. v. Betancourt, 2002 JTS 29 (2002)
156 D.P.R. 234, 2002 TSPR 23

Second Error

The Circuit Court of Appeals erred by deciding that since there was no just cause for the cancellation of the Consulting Contract signed by the Mayaguez Hilton and Heriberto Betancourt, said cancellation constitutes a wrongful act by the Mayaguez Hilton.

Third Error

The Circuit Court of Appeals erred by confirming the determination of the Court of First Instance that there was willful contractual misconduct in the cancellation of the Consulting Contract, when this matter had already been resolved otherwise and said decision is the law of the case.

Fourth Error

The Circuit Court of Appeals erred by deciding that the contractual option contained in the Consulting Contract survived the cancellation thereof and that it was duly exercised, during the judicial procedure of this case.

Fifth Error

The Circuit Court of Appeals erred by not deciding that the right of option acknowledged in the Consulting Contract had expired.

Sixth Error

The Court of First Instance erred by appointing a special commissioner to determine the amount of damages the defendant is entitled to and by stating that as to this issue, the decision of the commissioner shall be final. *Certiorari* Petition, pgs. 13-14.

In a Resolution dated May 5, 2000 this Court denied this appeal. In light of a motion for reconsideration filed by Hilton on May 22, 2000 we reconsidered said decision and, in a Resolution dated June 9, 2000, we issued this *certiorari*. At Hilton's request, we accepted the appeal as its brief. The appellee filed his corresponding brief afterwards, and therefore we are in a position to decide.

**II**

We will start by jointly discussing the fourth and fifth errors as they are intimately related.*246

[1] In *Atocha Thom McAn Inc. v. Registrador*, 123 D.P.R. 571 (1989), when evaluating the option contract we defined it as the agreement by which a party (called grantor, promissor or optionor) grants the other (called optionee, for a fixed term and under certain conditions, the faculty, left exclusively at its will, to decide whether to sign a principal contract. The following are essential requirement of the option contract: that one party grants the other the faculty of exclusively deciding whether to sign the option contract, for a fixed term without any other condition, other than the optionee's own judgment. J. Castan Tobeñas, *Derecho Civil Español, comun y foral*, 14th ed. Madrid, Ed Reus 1988, T. IV, pg. 50.

Theorist Puig Brutau 17 states that in this type of contract one does not merely option, but that the option is the possibility of entering into a previously outlined contract. That is, there is no contract that is just an option contract, rather a possibility for opting for the contract that had been considered as a final result of the negotiation.

[2] The right that originates the option agreement is an elective or formation right that can be a constitutive right, a modifying right or an extinguishing right and is characterized by immediately producing the effect by the mere declaration of the holder, without there being a correlative principal obligation of any other person. J. Sanchez Fontans, *Naturaleza de la Opcion*, Año XII (Num. 17) Rev. Der. Espanol y Americano 73 (1967).

The option contract, which is of a transitory nature, may be a principal agreement or an accessory agreement. *Atocha Thom McAn, Inc. v. Registrador*, supra. Therefore, options are applicable to a vast number of contracts. The professor of *247 Civil Law Torres Lana 18, contemplates the applicability of the figure to contracts such as the sale, partnership, financing, lease of goods and services.

[3] Our doctrine has also acknowledged the figure of the option to renew. Regarding this, see: *Atocha Thom McAn, Inc. v. Registrador*, supra; *Zeta Enterprises, Inc. v. E.L.A.*, 145 D.P.R. 1 (1998). This refers to the faculty granted to one of the contracting parties to, at its will, decide whether to renew or extend a contract in effect between the parties. In these cases, the option produces as an effect a mere modification of the contractual relationship. It is, therefore, a modifying option



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Mayaguez Hilton Corp. v. Betancourt, 2002 JTS 29 (2002)
156 D.P.R. 234, 2002 TSPR 23

In *Atocha Thom McAn, Inc. v. Registrador*, supra, pg. 585, when comparing an option to extend a lease to the extension we stated:

> The difference is that while in the contract of extension its continuation is a fact-because there is already an agreement of the parties- in the option the lease is subject to an uncertain condition: the exercise of the right by the optionee. Thus one cannot in judicial truth speak of a contract of extension of time if there is uncertainty about its existence.

With this in mind, let us evaluate the contract signed by Hilton and Mr. Betancourt and interpret its terms, according to our judicial doctrine in Arts. 1233 and 1236 of the Civil Code, 31 L.P.R.A. secs. 3471 and 3474, among others. 19 See, also: *Levy v. Aut Edif Publicos*, 135 D.P.R. 382 (1994)*248 *Marina Ind., Inc. v. Brown Boveri Corp.* 114 D.P.R. 64 (1983); *Merle v. West Bend Co,* 97 D.P.R. 403 (1969); *Rutledge v. Gill*, 78 D.P.R. 698 (1955)

By engaging in a contextual analysis of the terms stated in the clauses of the contract in question, especially the second clause quoted above, we can determine that Hilton and Betancourt signed a service contract which had a renewal option in favor of Mr. Betancourt, subject to the compliance of certain conditions. 20 We understand that having complied with the condition precedent to which the exercise of the option was subject, Mr. Betancourt had the right to decide whether or not to exercise his right of option and renew the lease of services contract.

Including the conditions in question did not alter the nature of the option. In *Zeta Enterprises, Inc. v. E.L.A.* supra pg. 10, when evaluating a services contract that included an option to extend we discussed the possibility of a right of option subject to the compliance of a condition and stated: "[n]onetheless, in the contract in question, the holder of the right of option does not have an unlimited scope of exercise of his will, rather his right is expressly conditioned to the compliance of two conditions….These provisions qualify the scope of the option, according to the will of the contracting parties."

Hilton alleges in its appeal before us that while it is true that the quoted second clause established an option contract, it was not exercised within the period of five years in which the contract was in effect, because Mr. Betancourt never expressed his desire to exercise the option during said *249 term. It added that the option clause was no more than an accessory provision to a principal contract and that because it was cancelled, the accessory rights disappeared, therefore, the right to exercise the option had expired. It is not correct.

[4] The option right is extinguished through positive exercise, thus giving rise to the accepted contract. It is also extinguished, without this positive effect, if [the optionee] lets the term granted run out without making any statement, or making a statement that has the effect of waiving the right. 21 Because of the temporary nature of the contract, it cannot exist without a period within which to exercise the same, regardless of how short or undetermined this period is. Therefore, the period for the exercise of the option is usually viewed as lapsable. For that reason, the right of the optionee to express his will to give effect to the option contract expires if this is not notified to the grantor during the term of the option, if said term had been established.

A reading of the contract in question convinces us that due to the nature of the conditions imposed for the exercise of the option and the provisions regarding the cancellation of the principal contract, it was imperative that the parties wait until the end of the term of the original contract so Mr. Betancourt could express himself regarding his desire of whether or not to exercise the option. This was so regardless of when the condition regarding the net profit of at least two million five hundred dollars ($2,500,000) was met. 22
This was not possible because Hilton, by ending the contract without just cause and eleven months before its *250 expiration, deprived Mr. Betancourt of the opportunity to exercise his right to option.23

[5] The grantor of the option is doubly bound; "he must not disturb the possible performance of the definitive contract and must also comply with the same." 24. Because of this, theorist Torres Lana, op. cit., pg. 109, states that :"it does not appear that the grantor is prevented from signing any other contracts, just those that pose an obstacle to the exercise of the option granted".

As to this, Sanchez Fontans, op cit, ,pg. 94 states:

> …the option pact generates an optional right that grants the holder the will to produce the effect, normally at the conclusion of the contract, by its own declaration of will. In that regard, the conduct assumed by the offerer is irrelevant. Nonetheless,



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

the offerer can do things that prevent the rights that result from the definitive contract from arising or being exercised and thus *compromise its contractual liability*. (Emphasis provided.)

Therefore, we understand that in the same way that the grantor has the obligation to not do anything that could frustrate the effectiveness of the contract if the optionee exercises in time his right, he cannot incur in voluntary, negligent, or fraudulent actions that could frustrate the expectation of the optionee to exercise his option right.  If he does so, he will incur in contractual responsibility and the affected optionee can file a damages action against the grantor that thwarted or affected his exercise of the power of optioning.  Applying these principles to the case at hand, while it is true that the option clause was accessory to the principal *251 contract and that Mr. Betancourt had not exercised the same at the moment the contract was cancelled, this does not prevent him from being compensated for the damages suffered as a consequence of him not being able to exercise the option. 25

[6-7] Those that incur in fraudulent acts, negligence or delinquency with regards to their obligations, and those that in any way act against them, will be subject to compensating damages. 26 *Master Concrete Corp. v. Fraya*, S.E. 152 D.P.R. 616 (2000). "As the optionee is not able to ask for compliance in kind... he can ask for compliance in the supplementary form of damages". See *Perez v. Sampedro*, 86 D.P.R. 526, 530 (1962).  Compensation for damages covers not only the value of the loss suffered but also the profit that the creditor failed to obtain. Art. 1059 of the Civil Code; 27 *Perez v. Sampredro*, supra.  Since this is a claim for breach of contract, we must conclude that Mr. Betancourt exercised his action in a timely manner. 28  We cannot agree with Hilton's argument that the right to exercise the option had been extinguished by the cancellation of the contract, because said right was thwarted by Hilton with its improper conduct.  Hilton cannot benefit from its own illegal acts to deprive a beneficiary of his rights.  The alleged errors were not committed. *252

### III

We will now evaluate the first and second errors.  These errors regard the decision of the C.C.A. to confirm the C.F.I.'s determination that Hilton acted wrongfully when ending the consulting contract before the date it was due.

The C.C.A. stated in its decision that Hilton's conduct was intentional and that it was obvious that its actions were meant to provoke a breach of the obligations and deprive the appellees of their right to exercise the option.  It concluded that it was not a case of a mere breach but a breach in bad faith, planned to prevent the appellees from exercising their right to option and continue with the consulting for the period of time stated in the option.  It based said decision on the motions filed before the C.F.I. 29

[8] When speaking of breach of an obligation, a distinction should be made between willful and negligent breach, which depends on whether the obligor engaged in a willful violation or if the breach was caused by his negligent conduct. t. F. Puig Pena, *Compendio de Derecho Civil Español*, 3rd ed., Madrid, Ed. Piramide, 1976, T. III, pg. 142.

Willful breach of contract is the conscious and voluntary failure of the debtor to comply with its obligation, knowing it will bring about an unjust act.  *Colon v. Promo Motor Imports*, Inc. 144 D.P.R. 659 (1997); *Canales v. Pan American*, 112 D.P.R. 329 (1982); *Marquez v. Torres Campos*, 111 D.P.R. 854 (1982). This assumes the obligor knows his obligation, is aware *253 of the action or inaction that will take place and of its consequences. 30 That is, a willful breach does not necessarily imply the malicious intent of the debtor, only knowledge of his own breach, that it will affect the creditor's expectation.

Hilton understands that the C.C.A. erred by concluding that it acted in willful breach, despite the fact that, in its understanding, Mr. Betancourt never alleged or claimed willful contractual misconduct.  As we will examine below, it argues that at no point during the litigation did Mr. Betancourt use the word "willful breach" to describe Hilton's actions.

[9] "The responsibility of proving both willful misconduct in the formation of the contract and willful misconduct in the performance of the obligation corresponds to whoever alleges said wrongful conduct." *Colon v. Promo Motors Imports, Inc.* supra pg. 668.  See *Canales v. Pan American*, supra.  It is a factual matter that cannot be based on the mere allegation of the claimant, proof needs to be provided, which must be exclusively evaluated by the judge of first instance. A. De Cossio y Corral *El Dolo en el Derecho Civil*, Madrid, 1955, pg.



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Mayaguez Hilton Corp. v. Betancourt, 2002 JTS 29 (2002)
156 D.P.R. 234, 2002 TSPR 23

353 J. Manresa Comments to the Spanish Civil Code, Madrid, 1967, B. VIII, Vol. I, pg. 218

However, even though the decision of whether willful misconduct was committed requires affirmative action by the one who alleges the existence of the willful misconduct, it is not necessary to use the words "willful misconduct" in the pleading. It will be enough to consider the nature of the claim to determine whether willful misconduct is alleged. Regarding this, see *Muniz de Leon v Melon Hnos. & Cia*, 56 D.P.R. 330 (1940). In the aforementioned case, a damages claim that originated from a illegal seizure of property, the appeal before us alleged that it was an error that in none of plaintiff's causes of action had he alleged malice, *254, lack of probable cause, bad faith, willful misconduct, fraud or negligence when filing the complaint. We rejected said argument and concluded that the facts alleged by plaintiff were sufficient to demonstrate that the damages had been caused by the fault or negligence of defendant and it was not necessary for plaintiff to use the words "fault" or "negligence". We see no reason not to apply the same rule here. Therefore, we must determine, from the nature of Mr. Betancourt's allegations, whether they were enough to clearly establish the elements of willful misconduct in Hilton's obligation, since it cancelled the consulting contract and therefore, prevented the exercise of the option right.

[10] From the documentary evidence before us, 31 on which the C.F.I. and the C.C.A. based their decision, we note that Mr. Betancourt filed a counterclaim against Hilton in light of the complaint filed by the latter regarding the administration contract between the parties. In his allegations in the counterclaim, Mr. Betancourt alleged that Hilton acted in bad faith for the sole purpose of depriving him of his legal rights and preventing him from doing what was agreed in the *administration agreement*. He added that Hilton fraudulently deceived him, making him believe he was not legally able to *administrate* the casino. He alleged, in the alternative, acting fraudulently and in bad faith, they made him sign a second contract (consulting contract) under different terms and conditions that put him at a disadvantage compared to the negotiations accomplished in the *255 previous contract (administration contract). 32 Mr. Betancourt in the counterclaim made reference to the consulting contract executed by the parties, certifying its existence, validity and renewal option contained therein. Afterwards, as a consequence of the unilateral cancellation of the consulting contract, Mr. Betancourt filed a motion to submit an amendment to the allegations to specify the damages allegation. In that motion, Mr. Betancourt requested that specific performance of the contract be ordered, or in the alternative, that plaintiffs-respondents be ordered to pay damages caused by the breach of contract. In that regard, he stated:

> Specifically, the appearing party is interested in supplementing paragraph A of the Counterclaim, ....to eliminate the request for specific performance and describe its claim for damages for breach the following way:
> A. [I]t is requested that this Honorable Court issue a judgment ordering....to respond jointly and severally for the damages caused for infringement or breach of the contractual obligations under the "Casino Consultant Agreement". ...33

At a later date, by way of motion to request summary judgment, Mr. Betancourt makes reference to the willful misconduct of Hilton in relation to the compliance of the consulting contract, arguing that "Hilton's unilateral act in ending the contract at the end of the fourth year prevented the period of five years from passing, intending with this, to avoid the obligation to renew the contract, at the option of Mr. Betancourt." 34 *256

Mr. Betancourt alleges before us that in the quoted counterclaim he alleged bad faith and willful misconduct by Hilton in its contractual obligations. He adds that the motion to submit an amendment to the pleadings specifically incorporated the allegations of bad faith and willful breach of contract in the elimination of Mr. Betancourt's rights to exercise the option to extend the consulting contract. We cannot agree with his arguments. An evaluation of the documents in question leads us to conclude that the allegations of Hilton's willful misconduct in the counterclaim had to do with the administration contract but not the consulting contract. In spite of the fact that there was an amendment to the allegations of the counterclaim, it was specified that the amendment was to alter the plea to claim damages for the breach of the consulting contract. 35 This is not an allegation of willful misconduct. A contrary conclusion would be extremely forced.

[11] We also reject the possibility of an amendment to the pleadings by way of motion for summary judgment. Regarding this, the theorist Cuevas Segarra understands that to deem the



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Mayaguez Hilton Corp. v. Betancourt, 2002 JTS 29 (2002)
156 D.P.R. 234, 2002 TSPR 23

allegations amended by way of motion for summary judgment or motion to dismiss violates the Rules of Civil Procedure. Regarding these motions he states:

> Said motions cannot be considered to be and are not permitted pleadings within the meaning of Rule 5.1 and 13 of Civil *257 Procedure. Moreover, there is an inveterate principle that the allegations are not evidence; therefore they also cannot have the effect of being deemed to be amended to conform to nonexistent evidence. 36

[12] Therefore, we reject Mr. Betancourt's argument to the effect that, in the alternative, there was an amendment to the allegations with the evidence. In fact, Rule 13.2 of Civil Procedure, 32 L.P.R.A. Ap. III states that even in the absence of a formal amendment, when the parties expressly or implicitly consent to submit to trial matters not alleged in the pleadings they will be considered as if they were alleged in the pleadings. (Emphasis provided.)

We understand that said principle applies to situations in which new allegations are made during the trial, but not to situations like this one, in which the facts and controversies were evaluated and adjudicated summarily. In light of the above, we must conclude that Mr. Betancourt did not make a timely allegation of willful misconduct in the performance of the consulting contract, and therefore, the appellate court erred by confirming the decision that Hilton had incurred in willful contractual breach.

In light of the above, it is unnecessary to discuss the second and third errors.

### IV

As a last error, Hilton questions the actions of the appellate court in sustaining the decision of the C.F.I. to appoint a Special Commissioner to determine the amount of the compensation owed to *258 Mr. Betancourt and stating that the decision of the Commissioner would be final.

[13] The appointment and faculties of a Special Commissioner are regulated by Rules 41.1-41.5 of Civil Procedure, 32 L.P.R.A. Ap. III. They state that the court in which a case or procedure is pending may appoint a Special Commissioner for said case or procedure. As an exception and not as a general rule this rule allows the court to assign a matter to the Special Commissioner, only if issues regarding accounts and difficult calculations of damages are involved or cases that involve extremely technical matters or of a highly specialized special knowledge. *Velez Ruiz v. ELA*, 111 D.P.R. 752 (1981).

The appropriateness of appointing a Special Commissioner in this case is evident, when we see that regarding the calculations and even with the assistance of an appointed Special Commissioner, the parties were immersed for years in controversies over the sums, amounts, salaries, debits and other calculations necessary to determine the commissions owed to Mr. Betancourt for Hilton's breach of the original term of the consulting contract.

We adopt the decision made by the C.C.A. that the C.F.I. described the function of the Special Commissioner as an exercise of an accounting expert, stating that his authority would be final regarding his findings and recommendations. At no point did the C.F.I. abdicate its ministerial duties, since a court always reserves the right to accept, modify, reject in all or in part, the recommendations of the appointed Special Commissioner, as well as receiving additional evidence or returning the report submitted by him. The alleged error was not made. *259

### V.

For the reasons stated above, we confirm the decision made by the Circuit Court of Appeals regarding the validity of the claim of the right of option of the appellee and the appointment of the Special Commissioner. We overturn the decision regarding willful contractual misconduct by Hilton. The case is returned to the Court of First Instance for the proceedings to continue in accordance with what has been decided here.

*A judgment will be issued accordingly.*

Footnotes

1 Appendix of the request for writ of certiorari, pg. 22
2 The text in its original language was the following:
"This agreement will terminate on December 31, 1993 provided, however that either party may terminate this agreement if the



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Mayaguez Hilton Corp. v. Betancourt, 2002 JTS 29 (2002)
156 D.P.R. 234, 2002 TSPR 23

casino incurs in operating losses for two consecutive years. Provided, however that Mr. Betancourt has the option of renewing this contract for an additional five (5) years [sic] period if the first five years of operation produce a net operating profit in excess of $2,500,000. During the renewal period the operation must produce a net operating profit of $500,000 before taxes per year. Should the casino not produce a net operating profit of $500,000 in any of the five (5) years this contract may terminate at Hilton's request. This agreement will terminate without liability to either party in the event Hilton's license terminates for any reason." Appendix pgs. 46-47.

3 Appendix of the request for writ certiorari, pg. 57.

4. Id., pgs. 96-98.

5 Id., pg. 139.

6. Id., pg. 162.

7 The Court of First Instance (hereinafter, C.F.I.) used the language required by the Rule 43.5 of Civil Procedure, 32 L.P.R.A. Ap. III to impart finality on a partial judgment.

8 Despite not having expressed itself regarding the existence of just cause for the early cancellation of the contract, the C.F.I., in its partial judgment granted a compensation for the period between the date Hilton terminated the consulting contract, January 31, 1993 and the due date originally agreed upon, December 31, 1993.

9 The C.F.I. stated: " In our Partial Judgment we decided the controversy between the parties regarding the Casino Consultant Agreement, the express term of effect of which was between January 1, 1988 and December 31, 1993. As we clearly indicated in the Decision and Order of January 31, 1997, what is pending is the controversy regarding the extension of said contract for five (5) additional years. The payment for the year 1993 was decided according to the terms of the Partial Judgment that decided the elements that under the contract gave rise to its termination" Decision and order of the C.F.I. of June 25, 1997, pgs. 1-2

10 Said motion for summary judgment was about the claim of the right of option.

11 The C.F.I. rejected the arguments of Mr. Betancourt in the Motion for Partial Summary Judgment that said clause was an option. This was based on the grounds that there was no certain term for its exercise and that, also, since it was conditional to the occurrence of other factors for the right to be perfected (conditions regarding the profit margin of the casino), this prevented its exercise from resting exclusively on Mr. Betancourt's will.

12 Article 1072 of the Civil Code, 31 L.P.R.A. sec 3047 states, "The condition will be considered met when the obligor voluntarily prevents it from being met"

13 The compensation was ordered for the period of January 1, 1994 through May 7, 1997, the date when Hilton's license expired according to the certification issued by the Tourism Company on May 14, 1999.

14 The court did not make a determination regarding the amounts that must be awarded as a result of its decision.

15 The file reflects that by the end of 1990 the casino had obtained a net profit of over two million five hundred thousand dollars ($2,500,000).

16 The C.C.A. emphasized that it was in agreement with the decision of the C.F.I. regarding the existence of willful misconduct in the illegal termination of the contract and the damages Mr. Betancourt was entitled to collect, if proven in a full hearing.

17 J. Puig Brutau *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1982, B. II Vol. 2, pgs. 48-65

18 J Torres Lana, *Contrato y Derecho de Opcion*, 2d Ed. Madrid, Ed. Trivium, 1987, pg. 98

19 Article 1233 of the Civil Code states:
" If the terms of a contract are clear and leave no doubt regarding the intention of the contracting parties, the clauses shall be interpreted literally."
" If the words appear contrary to the evident intention of the contracting parties, the latter shall prevail over the former". 31 L.P.R.A. sec. 3471

Art. 1236 adds:



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mayaguez Hilton Corp. v. Betancourt, 2002 JTS 29 (2002)
156 D.P.R. 234, 2002 TSPR 23

"if any clause in the contracts allows for various meanings, the most adequate to produce effect should be followed".
31 L.P.R.A. sec 3474

20 The second clause of the contract specified:
"...Mr. Betancourt has the option of renewing this contact for an additional five years *if the first five (5) years of operation produce a net operating profit in excess of $2,500,000.* During the renewal period the operation *must produce a net operating profit of $500,000 before taxes per year."* (Emphasis provided)  *Casino consultant agreement*, pg. 2

21 Puig Brutau, op cit, pg. 64

22 See n. 20  Note, as well, the following provisions contained in the quoted second clause of the contract:
"[P]rovided, however that either party may terminate this agreement if the casino incurs in operating losses for two consecutive years.
"Should the casino not produce a net operating profit for $500,000 in any of the five years this contract may terminate at Hilton's request."

23 It could be argued that the fixed term to exercise the option was during the sixth and final year of the original contract, that is, the renewal period.  However, we would come to the same conclusion if we adopted said assumption, as Hilton unilaterally cancelled the contract thirty days after said period started.

24 Torres Lana, op cit, pg. 108

25 It should be noted that at the moment of the cancellation of the contract, during the last year of effectiveness, the condition that the net profit in the first five years should exceed two million five hundred thousand dollars ($2,500,000) had already been met and the annual income of the casino exceeded the five hundred thousand dollars ($500,000).  Regarding the condition of profit during the renewal period, Art. 1072 of the Civil Code, *supra*, is applicable.

26 Art. 1054 of the Civil Code, 31 L.P.R.A. sec 3018

27 31 L.P.R.A. sec 3023

28 As they do not have a statute of limitations, claims for violation or breach of contract lapse at fifteen years.  Art. 1077 of the Civil Code, 31 L.P.R.A. sec 3052

29 Judgment of the Circuit Court of Appeals of February 15, 2000, pg. 9 Appendix of the request for writ of certiorari, pg. 10.

30 Puig Peña, op cit pg. 165

31 As a general rule, an appellate court cannot alter the conclusions of fact of an inferior court unless they are clearly erroneous.  However, the conclusions of fact may be altered when they are based solely on documentary evidence or expert witness testimony.  See *Moran v. Gracia*, 106 D.P.R. 155 (1977).

32 Answer to complaint and counterclaim pg. 11. Appendix of request for writ of certiorari, pg. 110

33 Motion submitting amendment to the pleadings, pg. 2 Appendix of request for writ of certiorari, pg. 140

34 Motion for summary judgment, pg. 5. Appendix of request for writ of certiorari, pg. 209

35 The following sums were requested:
1. Principal owed for services rendered since January 1, 1989 until January 31, 1993, and interest.
2. Principal owed for fees from February to December 1993 and interest.
3. Estimated value by December 31, 1994 of fees during 1994 to 1998 under the option granted in the consulting contract, if renewed for five years.
4. The sum of one million dollars ($1,000,000) for damages caused.

36 J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs, JTS, 2000, T.I. pgs. 323-324.



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.